IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:09-CV-17-FL

| | | |
|---|---|---|
| PEGGY RUSS and TAFFY GAUSE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER |
| SID CAUSEY, in his individual and official | ) | |
| capacity as Sheriff of New Hanover County; | ) | |
| ED MCMAHON, in his individual and official | ) | |
| capacity as Chief Deputy Sheriff of Hanover | ) | |
| County; LACHLAN MACNEISH, in his | ) | |
| individual and official capacity as Deputy | ) | |
| Sheriff of New Hanover County; DOUG | ) | |
| PRICE, in his individual and official capacity | ) | |
| as Deputy Sheriff of New Hanover County; | ) | |
| ERIC BROWN, in his individual and official | ) | |
| capacity as Deputy Sheriff of New Hanover | ) | |
| County; B. MATT JORDAN, in his individual | ) | |
| and official capacity as Deputy Sheriff of New | ) | |
| Hanover County; and OHIO CASUALTY | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

This matter comes before the court on defendants' motion for summary judgment pursuant

to Rule 56 of the Federal Rules of Civil Procedure (DE # 52). Plaintiffs have responded, and

defendants have replied. In this posture, the issues raised are ripe for ruling. For the reasons that

follow, the court grants in part and denies in part defendants' motion for summary judgment.[1]

---

[1] The court notes also as pending defendants' motions to strike Exhibits M, N, Q, V, and W to plaintiffs' memorandum in opposition (DE ## 56, 58). Defendants argue that these exhibits, which consist of certain law enforcement manuals and newspaper articles, are inadmissible under Rule 56(e) and the Federal Rules of Evidence. (continued...)

Plaintiffs Russ and Gause are the widow and the daughter, respectively, of Mr. Gladwyn T. Russ, Jr. Defendants are the former Sheriff of New Hanover County and a number of his deputies who allegedly acted inappropriately in planning and effectuating the arrest of Mr. Gladwyn T. Russ, III ("Mr. Russ" or "GT Russ") during decedent's funeral.[2] Mr. Russ is the son of plaintiff Russ and decedent, and the brother of plaintiff Gause. He is not a party to this action.

In their amended complaint, filed October 1, 2009, plaintiffs assert a number of claims for relief against defendants premised on defendants' conduct during the arrest of Mr. Russ. Specifically, plaintiffs allege: (1) deprivation of their constitutional right to privacy in violation of 42 U.S.C. § 1983; (2) assault; (3) negligent infliction of emotional distress; (4) intentional infliction of emotional distress; (5) invasion of privacy; and (6) negligence.[3] The assault claim is asserted only against defendant Jordan; the other claims are asserted against all defendants. Plaintiffs seek compensatory and punitive damages, attorneys' fees, and costs.

Defendants generally deny the allegations in the amended complaint and assert a number of affirmative defenses. On March 18, 2010, defendants moved for summary judgment on all of

---

[1](...continued)

Assuming without deciding that the law enforcement manuals were not admissible as originally submitted, plaintiffs have since cured any alleged defect, and the motion lodged at docket entry number 56 is DENIED. Plaintiffs' request for costs for responding to defendants' motion, apparently brought under 28 U.S.C. § 1927, is likewise DENIED where the court finds no bad faith on the part of defense counsel. As for the newspaper articles, these are inadmissible as hearsay. See Gantt v. Whitaker, 57 F. App'x 141, 150 (4th Cir. 2003) (per curiam) (unpublished) (citing United States v. ReBrook, 58 F.3d 961, 967 (4th Cir. 1995); Md. Highways Contractors Ass'n, Inc. v. Maryland, 933 F.2d 1246, 1251 (4th Cir. 1991)). Accordingly, the motion lodged at docket entry number 58 is ALLOWED.

[2] Defendant Ohio Casualty Insurance serves as the surety for defendant Causey's official bond, against which plaintiffs seek to collect. See N.C. Gen. Stat. § 58-76-5.

[3] Plaintiffs have withdrawn a seventh claim for negligent misrepresentation against defendant McMahon and their assault claim against defendant Brown.

2

plaintiffs' claims. Defendants contend that plaintiffs' claims fail as a matter of law in light of the undisputed facts underlying those claims, and also assert immunity from suit in both their individual and official capacities. In support of their motion, defendants rely on a number of depositions and declarations of both parties and non-party witnesses. Plaintiffs responded in opposition on April 8, 2010, also relying on a number of depositions and affidavits, as well as other materials. Defendants replied on April 19, 2010.

## STATEMENT OF THE UNDISPUTED FACTS

The undisputed facts, viewed in the light most favorable to plaintiffs, are as follows. On August 6, 2008, Glenda Sellars ("Ms. Sellars") swore out a criminal complaint against Mr. Russ, her husband, alleging that he had threatened to kill her the day before. (Pellom Decl. ¶ 3 & Ex. A; GT Russ Aff. ¶ 3.) Upon a finding that probable cause existed to believe the Mr. Russ had communicated a threat against Ms. Sellars in violation of N.C. Gen. Stat. § 14-277.1, New Hanover County Magistrate George Pellom issued a warrant for his arrest. (Pellom Decl. ¶ 4 & Ex. A.) The arrest warrant was received by the New Hanover County Sheriff's Office ("the Sheriff's Office") on August 7, 2008. (Gonzalez Decl. ¶ 4.)

Between August 8 and November 8, 2008, deputies from the Sheriff's Office attempted to serve the arrest warrant on Mr. Russ on at least ten occasions at his mobile home located behind his parents' house at 1304 Burnett Road in Wilmington, at his parents' house at that address, and at Ms. Sellars' given address. (Gonzalez Decl. ¶¶ 4-13 & Ex. B; Jordan Decl. ¶ 5; Jordan Dep. 11:2-12:2, 12:20-13:5.) On each of these occasions, the deputies were unable to locate Mr. Russ or otherwise serve the warrant. (Gonzalez Decl. ¶¶ 4-13 & Ex. B; Price Decl. ¶ 6). Plaintiff Russ witnessed three of these attempts, and informed one of the deputies that Mr. Russ and Ms. Sellars had reconciled and

3

were in Tennessee, and that Ms. Sellars wanted to withdraw her complaint and drop the charges against Mr. Russ. (Peggy Russ Dep. 30:12-31:10, 40:9-16, 42:1-23.)

On November 1, 2008, Mr. Russ returned from Tennessee to be with his father, whose health was in decline. (GT Russ Aff. ¶ 11; Peggy Russ Dep. 12:22-23, 14:1-6.) Upon his return, he did not attempt to surrender or turn himself in, nor did plaintiff Russ inform anyone from the Sheriff's Office that Mr. Russ was back in town. (Peggy Russ Dep. 50:5-14, 51:3-7.) Plaintiffs and Mr. Russ appeared to believe – incorrectly – that Ms. Sellars had withdrawn the criminal complaint against Mr. Russ, and were otherwise preoccupied with the failing health of Mr. Russ's father. (GT Russ Aff. ¶ 7; Peggy Russ Dep. 50:15-20, 51:6-16.)

On November 8, 2008, the Sheriff's Office responded to a 911 call from Mr. Russ's son, who stated that his father had slashed the tires and smashed the windows of his car, and locked himself inside the house of plaintiff Russ. (Gonzalez Decl. ¶ 14; GT Russ Aff. ¶ 11.) Deputy Gonzalez, who had previously attempted to serve the arrest warrant on Mr. Russ on a number of occasions, was the first to arrive on the scene. (Gonzalez Decl. ¶ 15.) He verified the property damage and hoped to be able to serve the arrest warrant on Mr. Russ. (Id.) Mr. Russ's son advised Deputy Gonzalez that Mr. Russ was alone in the house and that he had access to firearms. (Id. at ¶ 16.) Deputy Gonzalez then radioed for backup. (Id.)

After backup arrived, Deputy Gonzalez knocked on the door of the house and demanded that Mr. Russ surrender to him, but Mr. Russ refused to do so. (Gonzalez Decl. ¶ 18-19.) Plaintiff Gause arrived on the scene and spoke with Deputy Gonzalez, who told her that he was attempting to serve an arrest warrant on Mr. Russ. (Gonzalez Decl. ¶ 20; Gause Dep. 44:8-24, 45:8-9.) Deputy Gonzalez requested that plaintiff Gause talk to plaintiff Russ, who was at the hospital with her ailing

4

husband, to give the Sheriff's Office permission to enter her house and arrest Mr. Russ. (Gonzalez Decl. ¶ 20; Gause Dep. 45:1-7, 48:9-49:4.)

More deputies arrived and formed a perimeter around the house. (Gonzalez Decl. ¶ 21; Price Decl. ¶¶ 7-8.) Plaintiffs returned to the scene, but were directed to stay away from the house. (Gonzalez Decl. ¶ 22; Peggy Russ Dep. 51:25-52:11; Gause Dep. 50:9-51:16.) Plaintiff Russ then gave the deputies from the Sheriff's Office the keys to her house so that they could enter and arrest Mr. Russ. (Peggy Russ Dep. 52:9-11, 56:14-16; Gause Dep. 51:17-24, 52:11-17.) The deputies declined to enter the house, however, believing that it would be dangerous to do so where Mr. Russ was thought to be armed. (Price Decl. ¶¶ 8-10; McMahon Decl. ¶¶ 5-6, 10.)

When defendant McMahon arrived on the scene, he spoke with Mr. Russ over the telephone. (McMahon Dep. 22:17-23:12; McMahon Decl. ¶ 8.) Mr. Russ informed defendant McMahon that he had recently returned to Wilmington to be with his father during surgery to be performed on November 10, 2008. (McMahon Decl. ¶ 8; GT Russ Aff. ¶ 11.) Defendant McMahon verified this with plaintiffs and other family members at the scene, who also informed him that Ms. Sellars was not in North Carolina at the time. (McMahon Decl. ¶ 9.) Mr. Russ agreed to turn himself in following his father's surgery, and plaintiffs agreed to do everything in their power to ensure that Mr. Russ turned himself in as promised. (McMahon Decl. ¶¶ 8-10; GT Russ Aff. ¶ 12; Peggy Russ Dep. 57:2-13; Gause Dep. 55:17-25.) The deputies left the scene, and plaintiffs and Mr. Russ went back to the hospital. (McMahon Decl. ¶ 11; Gause Dep. 57:10-58:24.)

Mr. Russ did not turn himself in on November 10, 2008. (McMahon Decl. ¶ 12.) On that day, his father took a turn for the worse, dying on November 11, 2008. (Peggy Russ Dep. 44:9-45:17; Peggy Russ Aff. ¶ 2; GT Russ Aff. ¶ 13.) When Deputy Gonzalez later returned to plaintiff

5

Russ's house to serve the outstanding warrant on Mr. Russ, he was informed that Mr. Russ's father had died. (Gonzalez Decl. ¶ 29; Peggy Russ Dep. 45:18-47:5.) On November 12 or November 13, 2008, plaintiff Russ and Mr. Russ spoke with defendant McMahon and notified him that Mr. Russ's father had indeed died and that the family was busy making funeral arrangements. (Peggy Russ Dep. 47:6-48:6; McMahon Decl. ¶¶ 14-15.) Defendant McMahon agreed to allow Mr. Russ to turn himself in after his father's funeral.[4] (Peggy Russ Dep. 48:10-11; GT Russ Aff. ¶¶ 15.)

On November 13, 2008, defendant McMahon and other senior law enforcement officers at the Sheriff's Office, worried that Mr. Russ would not turn himself in but would flee their jurisdiction to evade arrest and possibly harm Ms. Sellars, decided that their best chance to serve the arrest warrant was to do so after the funeral service, which they were confident Mr. Russ would attend. (McMahon Decl. ¶¶ 16-18; Price Decl. ¶ 13.) Defendant McMahon, after speaking with defendant Causey, authorized the arrest of Mr. Russ at some point after the funeral, in a manner to be carried out as discreetly and quickly as possible, but left the details of the arrest plan to defendant Price. (McMahon Decl. ¶ 18; Price Decl. ¶ 13; Causey Aff. ¶¶ 10-11.) Defendant Price then formulated a plan whereby plainclothes deputies would arrest Mr. Russ in the parking lot of Andrews Valley Mortuary ("the funeral home") immediately following his father's funeral service.[5] Defendant Price

---

[4] Plaintiffs contend that defendant McMahon specifically told them that no one from the Sheriff's Office would come to arrest Mr. Russ until after the funeral. (Peggy Russ Aff. ¶ 23; GT Russ. Aff. ¶ 15.) Defendants contend that no such promise was made, and that defendant McMahon merely promised that no one from the Sheriff's Office would attempt to arrest Mr. Russ at plaintiff Russ's house before the funeral. (McMahon Decl. ¶ 15; Gonzalez Decl. ¶ 30; Jordan Dep. 16:12-17:4.) The court construes the facts in the light most favorable to plaintiffs.

[5] Andrews Valley Mortuary is located at 4108 South College Road in Wilmington, North Carolina. (Hoy Aff. ¶ 25.) It has a standalone parking lot with two entrances. (Id.) The parking lot is on private property, although it is accessible to the public and there are no "No Trespassing" signs. (Id. ¶ 29.) Presumably, the lot is meant for customers of the funeral home and their guests, and plaintiffs paid to rent the facility for the purposes of conducting the funeral. (Id. ¶ 30.) The funeral itself, though intended to be a private service, was open to any individual who wished to pay his or her respects. (Peggy Russ Aff. ¶¶ 6-7; Gause Aff. ¶¶ 4-5.)

6

relayed this plan to McMahon. (Price Decl. ¶ 14; Jordan Decl. ¶¶ 7-8; "Incident Action Plan," Pls.' Mem. Opp. Mot. Summ. J. Ex. I.)

Before the funeral, defendants Brown and Jordan, who were wearing civilian suits and ties, drove to an adjacent animal hospital to observe the funeral home, then parked their unmarked car in an empty parking space in the funeral home's parking lot once all of the funeral attendees had gone inside. (Brown Decl. ¶¶ 8-10; Jordan Decl. ¶¶ 9-10.) Other law enforcement officers from the Sheriff's Office took up positions surrounding the funeral home to prevent escape. (Price ¶ 16; McNeish ¶¶ 10-11.) Defendants Brown and Jordan waited in the funeral home's parking lot for Mr. Russ to exit the service. (Brown Decl. ¶ 11.) No one from the Sheriff's Office had informed Andrews Valley Mortuary of the plan to arrest Mr. Russ. (Price Aff. ¶ 14; Hoy Aff. ¶ 28.)

The parties differ as to exactly what happened after Mr. Russ exited the funeral home at the conclusion of the service, although their versions of events do overlap. Accepting plaintiffs' version as true where there are differences, the arrest itself occurred as follows. Defendants Brown and Jordan approached Mr. Russ next to the hearse and attempted to arrest him. According to plaintiffs, defendants Brown and Jordan violently grabbed Mr. Russ as he was putting his father's casket in the hearse, and threw him against that vehicle. (GT Russ Aff. ¶¶ 19-20; Simmons Aff. ¶¶ 11, 15; Hoy Aff. ¶¶ 8-10.) A struggle ensued between Mr. Russ and the two deputies, and a crowd gathered around the men. (Brown Decl. ¶¶ 13-15; Jordan Decl. ¶¶ 13-15; Price ¶ 18; Peggy Russ Aff. ¶ 12.) Plaintiffs state that the deputies never identified themselves as law enforcement officers, and that funeral attendees believed that they were criminals attacking Mr. Russ. (GT Russ Aff. ¶ 20; Simmons Aff. ¶¶ 13-16, 21, 29-30; Hoy Aff. ¶¶ 6, 11.) Although plaintiffs were on the other side of the funeral home sitting in a limousine when the deputies first approached Mr. Russ, they heard

7

the loud noise accompanying the attempted arrest and ran over to investigate. (Peggy Russ Aff. ¶¶ 9, 11; Gause Aff. ¶¶ 8-10.)

During the scuffle with Mr. Russ, defendant Brown's back-up firearm had become dislodged and had fallen to the pavement. (Brown Decl. ¶¶ 15-16; Jordan Decl. ¶ 14; Hoy Aff. ¶ 10.) Accordingly, in an attempt to control the crowd, defendant Jordan drew his Taser, which to plaintiffs appeared to be a firearm.[6] (Jordan Aff. ¶ 15-16; Brown Aff. ¶ 20; Peggy Russ Aff. ¶ 14; Gause Aff. ¶ 12; Hoy Aff. ¶ 15.) Even when asked by plaintiffs, the deputies allegedly refused to identify themselves and threatened to shoot bystanders who attempted to meddle. (Peggy Russ Dep. 70:3-9, 126:22-129:4; Peggy Russ Aff. ¶¶ 15-17; Gause Dep.; Gause Aff. ¶ 12; Simmons Aff. ¶¶ 27, 29.) Plaintiffs contend that while doing so, the deputies were waiving their Tasers wildly at plaintiffs and other bystanders. (Peggy Russ Dep. 70:21-22, 72:2-22; 130:1-131:11; Gause Dep. 92:13-23; Hoy Aff. ¶¶ 15, 17.) Eventually, defendant Brown did employ his Taser against Mr. Russ in order to subdue him. (Brown Decl. ¶ 18; Jordan Decl. ¶ 16; Gause Aff. ¶ 14; Hoy Aff. ¶ 14.)

At some point during the arrest of Mr. Russ, defendants Brown and Jordan had radioed for assistance. (Price Aff. ¶ 17; MacNeish ¶ 17; Brown Aff. ¶ 19) Defendants Price and MacNeish, who had been maintaining positions around the funeral home to prevent escape, responded, arriving at the scene at about the time Mr. Russ was placed in handcuffs. (Price Aff. ¶ 18; MacNeish ¶ 18; Brown Aff. ¶¶ 20-21; Jordan Aff. ¶ 17.) Defendant Price discussed the arrest with the funeral

---

[6] A Taser is "a gun that fires electrified darts to stun and immobilize a person." Merriam-Webster's Online Dictionary, available at http://www.merriam-webster.com/dictionary/taser (accessed July 8, 2010); see also http://www.taser.com (accessed June 25, 2010). Plaintiffs' assertions that defendant Jordan drew a firearm rather than a Taser are not supported. Mr. Hoy confirms that defendant Jordan drew a Taser (Hoy Aff. ¶ 15), and Mr. Simmons and Mr. Russ describe the weapon as "look[ing] like a gun" and a "gun-like device" without stating that the device was in fact a firearm (Simmons Aff. ¶¶ 25, 28; GT Russ Aff. ¶ 24). Plaintiffs, who claim that the weapon was a firearm (Peggy Russ Aff. ¶ 14; Gause Aff. ¶ 12), admittedly cannot distinguish between a firearm and a Taser. (Peggy Russ Dep. 72:13-18; Gause Dep. 133:18-135:12.) The court finds no dispute that the device in question was a Taser.

8

attendees. (Price Aff. ¶¶ 19, 21; MacNeish ¶¶ 19-20, 22)  Although plaintiffs had by this time returned to their limousine to be taken to the cemetery, other funeral attendees contend that defendant Price was rude during this discussion, further exacerbating the situation. (Hoy Aff. ¶ 18; Simmons Aff. ¶ 33.)  Eventually, defendants Brown and Jordan transported Mr. Russ to New Hanover County Detention Center, stopping first at a nearby parking lot to properly search Mr. Russ as they had not had the opportunity to do so in the commotion at the funeral home.  (Price Aff. ¶¶ 23-24; MacNeish ¶¶ 23-24; Brown Aff. ¶¶ 22-26; Jordan Aff. ¶¶ 18-22.)

Following the arrest, employees at Andrew's Mortuary spent thirty (30) minutes restoring order, and many people in attendance at the funeral service did not go to the cemetery for the burial. (Peggy Russ Aff. ¶ 25; Gause Aff. ¶ 18; Hoy Aff. ¶¶ 19-20.)  Plaintiffs state that they and other individuals at the funeral service were in shock over what had happened. (Simmons Aff. ¶ 21; Gause Dep. 107:23-24.)  The next day, or shortly thereafter, plaintiffs met with defendant McMahon, who apologized for the events at the funeral home and indicated that the arrest was supposed to have occurred after the burial. (Peggy Russ Dep. 86:5-16; Gause Dep. 155:5-11; see also McMahon Dep. 49:7-15; Causey Aff. ¶ 10.)  The law enforcement officers involved in the arrest were orally reprimanded by defendant Causey.  (Jordan Dep. 9:8-10:9; McMahon Dep. 18:9-20:14.)

## DISCUSSION

A.    Standard of Review

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show that there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986).  The party seeking summary judgment bears the initial burden of

9

demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Id. at 587; Anderson, 477 U.S. at 250.

B.    Analysis of § 1983 Claim

1.    Qualified Immunity

Government officials sued in their individual capacities are entitled to qualified immunity from civil damages under § 1983 so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Qualified immunity thus provides a 'safe-harbor' from tort damages for police officers performing objectively reasonable actions in furtherance of their duties." Porterfield v. Lott, 156 F.3d 563, 567 (4th Cir. 1998). "This 'safe harbor' ensures that officers will not be liable for 'bad guesses in gray areas' but only for 'transgressing bright lines.'" Doe v. Broderick, 225 F.3d 440, 453 (4th Cir. 2000) (citations omitted); see also Rogers v. Pendleton, 249 F.3d 279, 286 (4th Cir. 2001) ("[Q]ualified immunity affords protection to an officer who takes an action that is not clearly forbidden-even if the action is later deemed wrongful."). The Fourth Circuit has recognized a two-pronged qualified immunity inquiry:

> First, we must decide whether a constitutional right would have been violated on the facts alleged. Next, assuming that the violation of the right is established, courts must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right.

10

Bailey v. Kennedy, 349 F.3d 731, 739 (4th Cir. 2003) (internal quotations omitted). The court may start with either of the two steps. Pearson v. Callahan, 555 U.S. __, __, 129 S.Ct. 808, 818 (2009). With respect to the second step, "[t]he relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was lawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001).

Plaintiffs contend that the arrest of Mr. Russ in the parking lot of Andrews Mortuary was an unconstitutional Fourth Amendment "search" because it invaded plaintiffs' privacy with respect to the funeral of their husband and father.[7] A Fourth Amendment search "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." United States v. Jacobsen, 466 U.S. 109, 113 (1984). Plaintiffs must exhibit an actual expectation of privacy by engaging in conduct seeking to preserve a matter as private, and that expectation of privacy must be one that

---

[7] Plaintiffs exclusively rely on the Fourth Amendment, made applicable to the states through the Fourteenth Amendment, in their memorandum opposing summary judgment. See U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); Mapp v. Ohio, 367 U.S. 643, 654-55 (1961). The court understands plaintiffs' claims to be specifically limited to an allegation that defendants violated the Fourth Amendment prohibition on unreasonable searches, as plaintiffs focus on "privacy" rather than plaintiffs' dominion or control of their persons or their property. See Horton v. California, 496 U.S. 128, 133 (1990) ("A search comprises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property.").

To the extent plaintiffs seek also to assert a violation of a substantive due process right to privacy, such a claim is unavailing. "There is no general constitutional right to privacy." Edwards v. City of Goldsboro, 178 F.3d 231, 252 (4th Cir. 1999) (affirming dismissal of § 1983 action alleging violation of "right to privacy"); see also Soldal v. Cook County, 506 U.S. 56, 64 (1992) ("[T]he Fourth Amendment can neither be translated into a provision dealing with constitutionally protected areas nor into a general constitutional right to privacy." ). Any § 1983 claim sought to be litigated based on a generic constitutional "right to privacy" must accordingly be dismissed. See, e.g., Newhard v. Borders, 649 F. Supp. 2d 440, 449-50 (W.D. Va. 2009); Phillips v. Bailey, 337 F. Supp. 2d 804, 807 (W.D. Va. 2004); Lynn v. O'Leary, 264 F. Supp. 2d 306, 310-11 (D. Md. 2003).

Finally, the court notes that the § 1983 claim as set forth in the complaint also alleges that defendants violated plaintiffs' rights under Article 1, Section 19 of the North Carolina Constitution. Plaintiffs appear to have abandoned this contention in their memorandum opposing summary judgment. To the extent that plaintiffs do still seek to bring a cause of action under § 1983 for violation of their rights under the North Carolina Constitution, such a claim fails because "section 1983 is not a vehicle that can be used to vindicate rights under a state constitution." Whitesell v. Town of Morrisville, 446 F. Supp. 2d 419, 424 (E.D.N.C. 2006) (citing Clark v. Link, 855 F.2d 156, 161-63 (4th Cir. 1988); Street v. Surdyka, 492 F.2d 368, 371 (4th Cir. 1974)).

11

society is prepared to recognize as reasonable. Bond v. United States, 529 U.S. 334, 338 (2000). "The 'touchstone' of Fourth Amendment analysis is whether the individual has a reasonable expectation of privacy in the area searched." United States v. Breza, 308 F.3d 430, 433 (4th Cir. 2002) (citing Oliver v. United States, 466 U.S. 170, 177 (1984)).

It is a "basic Fourth Amendment principle . . . that a person has no 'reasonable expectation of privacy' when he leaves conditions permitting a curious passerby to invade his 'private space.'" L.R. Wilson & Sons, Inc. v. Occupational Safety & Heath Review Comm'n, 134 F.3d 1235, 1239 (4th Cir. 1998) (internal quotation marks omitted). In the instant case, the arrest occurred in the publicly-accessible parking lot of Andrews Valley Mortuary. Cf. G.M. Leasing Corp. v. United States, 429 U.S. 338, 351 (1977) ("The seizures . . . took place on public streets, parking lots, or other open places, and did not involve any invasion of privacy."); United States v. Finch, 679 F.2d 1083, 1085 (4th Cir. 1982) (finding no reasonable expectation of privacy in "a parking lot where, along with any other member of the public, [officer] could lawfully look into [vehicles]"). That parking lot had no fence, there were no signs prohibiting trespassing, and those leaving the funeral home were plainly visible to the public. Cf. United States v. Taylor, 90 F.3d 903, 908-09 (4th Cir. 1996) (noting these same factors in finding no expectation of privacy in a dining room whose contents were viewable from front porch of house). Indeed the funeral service itself was open to anyone wishing to attend. No reasonable expectation of privacy exists in these circumstances.[8]

---

[8] Defendants also argue that the existence of a valid warrant defeats plaintiffs' claim under § 1983 because, under North Carolina law, "an officer having a warrant for arrest in his possession may arrest the person named or described therein at any time and at any place within the officer's territorial jurisdiction." N.C. Gen. Stat. § 15A-401(a)(1). However, this is not insufficient in and of itself: the Fourth Amendment has long been held to prohibit serving an arrest warrant for an individual in a third party's home absent a separate search warrant for that residence. See Steagald v. United States, 451 U.S. 204 (1981). Nevertheless, the home is recognized as having special significance in Fourth Amendment jurisprudence, see, e.g., United States v. U.S. Dist. Ct. for E. Dist. of Mich., 407 U.S. 297, 313

(continued...)

12

The court finds particularly instructive the Fifth Circuit's decision in <u>Kee v. City of Rowlett</u>, 247 F.3d 206 (5th Cir. 2001). The plaintiffs in <u>Kee</u> brought a § 1983 claim against two police officers and a city attorney who had placed electronic surveillance equipment at an outdoor grave site memorial service for two children who were murdered by their mother. <u>Id.</u> at 208. Plaintiffs, the father and grandmother of the children, alleged that this conduct violated their rights under the Fourth and Fourteenth Amendments to be free from unreasonable searches and seizures, as well as a general constitutional right to privacy. <u>Id.</u> at 209. As to the Fourth Amendment claim, the Fifth Circuit found that plaintiffs had no reasonable expectation of privacy at the grave-site service, stating:

> [Plaintiffs] failed to present evidence demonstrating any affirmative steps taken to preserve their privacy. While it is apparent from their affidavits that they did not expect government agents surreptitiously to be recording their prayers, they also were aware that the service was being conducted in an outdoor setting. [Plaintiffs] fail to allege that they took any steps to ensure that unwanted individuals were excluded or that they did anything to preserve the private nature of the service. They point to no reasonable safeguards or common-sense precautions taken to preserve their expectation of privacy.

<u>Id.</u> at 216-17; <u>see also id.</u> at 217 n.21 ("The fact that the prayers and conversations took place in an outdoor publicly accessible space is a difficult hurdle for [plaintiffs] to overcome.").

As in <u>Kee</u>, the funeral service in the instant case was undoubtedly a highly emotional and personal event at which plaintiffs expected no interference from law enforcement. But the arrest of Mr. Russ in the outdoor, open parking lot of the funeral home where that service took place did not implicate the Fourth Amendment. Plaintiffs had "no constitutional right to be free from witnessing

---

[8](...continued)
(1972), and "[w]hat a person knowingly exposes to the public, even in his own home . . ., is not a subject of Fourth Amendment protection," <u>Katz v. United States</u>, 389 U.S. 347, 351 (1967). It is for these reasons, not the presence of a warrant, that plaintiffs' Fourth Amendment claim must fail.

13

this police action." Grandstaff v. City of Borger, 767 F.2d 161, 172 (5th Cir. 1985) (dismissing § 1983 claim of widow and two stepsons who witnessed police officers shoot and kill their husband and stepfather, who officers mistook for a fugitive). Because plaintiffs have shown no constitutional violation, defendants are entitled to qualified immunity for the § 1983 action against them in their individual capacity, and their motion for summary judgment as to this claim is GRANTED.

   2.  Official Capacity § 1983 Claim

  Plaintiffs' § 1983 claim against defendants in their official capacities is treated as an action against the Sheriff's Office as an entity. Kentucky v. Graham, 473 U.S. 159, 165-66 (1985). For liability to attach, plaintiffs must show a violation of their constitutional rights that was caused by either (1) a municipal policy, practice or custom or (2) the municipality's failure to train its employees. See City of Canton v. Harris, 489 U.S. 378, 388 (1989); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). Although qualified immunity does not bar an official capacity claim under § 1983, see Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 335 n.11 (4th Cir. 2009), such a claim fails as a matter of law where there is no underlying constitutional violation. See Hinkle v. City of Clarksburg, 81 F.3d 416, 420-21 (4th Cir. 1996). As discussed above, the undisputed facts demonstrate that plaintiffs suffered no constitutional violation here. Defendants' motion for summary judgment as to the official capacity § 1983 claim is therefore GRANTED.

C.  Analysis of State Law Causes of Action

  Although defendants allege a number of immunities from suit, the court finds it helpful to first determine whether the undisputed facts can show liability for the state law causes of action alleged by plaintiff even absent immunity. These claims include (1) assault; (2) negligent infliction

14

of emotional distress; (3) intentional infliction of emotional distress; (4) invasion of privacy; and (5) negligence. Plaintiffs have also asserted a claim for punitive damages.

1.    Assault

Plaintiffs allege that defendant Jordan assaulted them during the arrest of Mr. Russ. North Carolina follows the traditional common law definition of assault: "an offer to show violence to another without striking him . . . ." Dickens v. Puryear, 302 N.C. 437, 444, 276 S.E.2d 325, 330 (1981). "The elements of assault are intent, offer of injury, reasonable apprehension, apparent ability, and imminent threat of injury." Hawkins v. Hawkins, 101 N.C. App. 529, 533, 400 S.E.2d 472, 475 (1991), aff'd, 331 N.C. 743, 417 S.E.2d 447 (1992); see also Dickens, 302 N.C. at 445, 276 S.E.2d at 331. In an action for assault against a law enforcement officer engaged in an arrest, plaintiffs must demonstrate a use of force "which is excessive under the given circumstances." Glenn-Robinson v. Acker, 140 N.C. App. 606, 625, 538 S.E.2d 601, 615 (2000), disc. rev. denied, 353 N.C. 372, 547 S.E.2d 811 (2001). "Although the officer has discretion, within reasonable limits, to judge the degree of force required under the circumstances, 'when there is substantial evidence of unusual force, it is for the jury to decide whether the officer acted as a reasonable and prudent person or whether he acted arbitrarily and maliciously.'" Myrick v. Cooley, 91 N.C. App. 209, 215, 371 S.E.2d 492, 496 (quoting Todd v. Creech, 23 N.C. App. 537, 539, 209 S.E.2d 293, 295 (1974)), disc. rev. denied, 323 N.C. 477, 373 S.E.2d 865 (1988).[9]

---

[9] Plaintiffs note that this standard has primarily been applied to claims of assault made by the individual being arrested. See, e.g., Glenn-Robinson, 140 N.C. App. at 625, 538 S.E.2d at 615; Myrick, 91 N.C. App. at 215, 371 S.E.2d at 496. The court can discern no reason, however, why the standard should be different for shows of force to third parties present during the arrest. The language used by the courts is not couched in terms that are limited to the individual being arrested, and law enforcement officers must enjoy the same freedom, within reason, to use appropriate force and displays of force to effectuate arrests without fear of liability from suits brought by bystanders as by the individual arrested.

15

Plaintiffs have not put forward substantial evidence of unusual force. Plaintiffs' assault claim stems from defendant Jordan's display of a Taser during the arrest of Mr. Russ. The undisputed facts establish that defendant Jordan did so only in the face of a large and angry crowd surrounding himself and defendant Brown. Moreover, at the time of the alleged assault, defendant Brown's back-up firearm had fallen to the pavement, where it was accessible to the crowd. Indeed, Mr. Hoy admits to reaching for the gun. (Hoy Aff. ¶ 12.) In this situation, it was not unreasonable or unusually forceful for defendant Jordan to draw his Taser in an attempt to control the crowd, prevent their interference with the arrest, and stop anyone from gaining control of deputy Brown's backup pistol. Nor does the fact that defendant Jordan acted like a "bully" in threatening to shoot onlookers elevate his display of force to "assault" where defendant Jordan could reasonably have perceived this threat as necessary to halt the approaching and apparently hostile crowd. Where the undisputed evidence does not call into question the reasonableness of Jordan's use of force under the circumstances presented, plaintiffs have failed to assert an assault claim.

2.    Negligent Infliction of Emotional Distress

Plaintiffs' second state law claim alleges that defendants negligently inflicted emotional distress upon them. A claim for negligent infliction of emotional distress has three elements: (1) negligent conduct by defendants (2) where it was reasonably foreseeable that such conduct would cause and did in fact cause (3) severe emotional distress. Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A., 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990); see also McAllister v. Ha, 347 N.C. 638, 645, 496 S.E.2d 577, 582-83 (1998) (quoting Johnson). For the reasons that follow, the court finds that plaintiffs have sufficiently put forward facts to avoid summary judgment against them as to this claim.

16

The first prong, negligence, is shown by "ordinary negligence," see Johnson, 327 N.C. at 304, 395 S.E.2d at 97, meaning "the failure to exercise that degree of care which a reasonable and prudent person would exercise under similar conditions," Hart v. Ivey, 332 N.C. 299, 305, 420 S.E.2d 174, 177-78 (1992); see also Best v. Duke Univ., 337 N.C. 742, 752, 448 S.E.2d 506, 511-12 (1994) (holding that a law enforcement officer is held to standard of care that "a reasonably prudent person would exercise in the discharge of official duties of a like nature under like circumstances"). Viewed in the light most favorable to plaintiffs, plaintiffs and other horrified onlookers observed Mr. Russ being arrested during his father's funeral while Mr. Russ was putting the casket into the hearse by plainclothes officers who failed to identify themselves as such, followed by brutish and bullying behavior by those officers and their superiors to grieving family and friends. Although defendants may have rightly concluded that Mr. Russ was a flight risk, a jury could determine that their conduct was that in which a reasonably prudent person would not have engaged. See also Schaffner v. Cumberland County Hosp. Sys., Inc., 77 N.C. App. 689, 691, 336 S.E.2d 116, 117 (1985) ("Issues of negligence should ordinarily be resolved by a jury and are rarely appropriate for summary judgment."), disc. rev. denied, 316 N.C. 195, 341 S.E.2d 578 (1986).

Where plaintiffs allege emotional distress based on defendants conduct towards Mr. Russ, a third-party, factors to be considered in the second "foreseeability" prong include "plaintiff[s'] proximity to the negligent act, the relationship between the plaintiff[s] and the other person for whose welfare the plaintiff[s] [are] concerned, and whether the plaintiff[s] personally observed the negligent act." Johnson, 327 N.C. at 305, 395 S.E.2d at 98. Each of these factors as applied to the instant case suggest that it was reasonably foreseeable that defendants' conduct could cause plaintiffs severe emotional distress. Plaintiffs were present at the funeral and were close to defendants Brown

17

and Jordan and Mr. Russ during most of the allegedly negligent conduct; plaintiffs are close relatives to both Mr. Russ and Mr. Russ's father, the decedent; and plaintiffs personally observed the allegedly negligent act. In these circumstances, the question of foreseeability is best left to the jury. See also Fox-Kirk v. Hannon, 142 N.C. App. 267, 274, 542 S.E.2d 346, 352, disc. rev. denied, 353 N.C. 725, 551 S.E.2d 437 (2001).

Finally, plaintiffs must show "severe emotional distress," defined as "any emotional or mental disorder, such as . . . neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." Johnson, 327 N.C. at 304, 395 S.E.2d at 97. An actual diagnosis by a medical professional is not required to assert severe emotional distress. Soderlund v. Kuch, 143 N.C. App. 361, 371, 546 S.E.2d 632, 639, disc. rev. denied, 353 N.C. 729, 551 S.E.2d 438 (2001). But plaintiffs must "at least forecast some evidence showing severe and disabling psychological problems." Fox-Kirk, 142 N.C. App. at 281, 542 S.E.2d at 356. Here, the court finds that plaintiffs have forecast such evidence where their claims of depression, anxiety, insomnia, and phobia of law enforcement officers are supported by sworn affidavits and find some support in the depositions of their primary care physicians.

3.      Intentional Infliction of Emotional Distress

Plaintiffs' third claim is for intentional infliction of emotional distress. As with negligent infliction of emotional distress, a claim for intentional infliction of emotional distress has three elements: (1) extreme and outrageous conduct by defendants (2) which is intended to and does in fact cause (3) severe emotional distress. Holloway v. Wachovia Bank & Trust Co., 339 N.C. 338, 351, 452 S.E.2d 233, 240 (1994). For the reasons that follow, the court determines that plaintiffs

18

have shown "extreme and outrageous conduct" and sufficient intent to cause severe emotional distress only by certain defendants. As mentioned, the court has already determined that plaintiffs have forecast sufficient evidence to satisfy the third element of this claim.

"Extreme and outrageous conduct" is shown by conduct which "shock[s] the conscience" or "exceeds all bounds of decency tolerated by society." West v. King's Dep't Store, Inc., 321 N.C. 698, 704, 365 S.E.2d 621, 625 (1988). The conduct must be "so outrageous in character, and so extreme in degree, . . . to be regarded as atrocious, and utterly intolerable in a civilized community." Foster v. Crandell, 181 N.C. App. 152, 168, 638 S.E.2d 526, 537, disc. rev. denied, 361 N.C. 567, 650 S.E.2d 602 (2007). The question of whether conduct is "extreme and outrageous" is a question of law, but the jury is the ultimate arbiter as to whether the conduct is sufficiently extreme and outrageous to result in liability. Smith-Price v. Charter Behavioral Health Sys., 164 N.C. App. 349, 354-55, 595 S.E.2d 778, 783 (2004).

Although it is a close question, the court finds that the conduct of defendants Brown, Jordan, and Price, in the light most favorable to plaintiffs, could be considered extreme and outrageous conduct, particularly as it occurred during a funeral and was in part directed towards elderly and particularly emotional individuals. Cf. Kling v. Harris Teeter, 338 F. Supp. 2d 667, 674 (W.D.N.C. 2002) (noting that an arrest in the middle of the night is not extreme and outrageous, but "shoving an elderly man" could be); Floyd v. Atl. Coast Line Ry. Co., 167 N.C. 55, 83, S.E. 12, 12-13 (1914) ("There is a duty imposed by the universal feelings of mankind to be discharged by some one toward the dead, a duty, and we may also say a right, to protect from violation, and a duty on the part of others to abstain from violation."). As to the other defendants, their alleged participation in the arrest

19

does not meet the high threshold for "extreme and outrageous" conduct.[10] Accordingly, plaintiffs' claims against defendants Causey, McMahon, and MacNeish are insufficient to submit to a jury, and summary judgment is GRANTED as to these defendants only.

The second element of an intentional infliction of emotional distress cause may be shown not only by an intent to cause harm but also "where defendant's actions indicate a reckless indifference to the likelihood that they will cause severe emotional distress." Dickens, 302 N.C. at 452, 276 S.E.2d at 335. The remaining defendants' conduct, which the court has already detailed above, sufficiently indicates a reckless indifference to the likelihood that those actions would cause severe emotional distress that this question should be left for the jury. Accordingly, plaintiffs' claims against defendants Brown, Jordan, and Price do not fail as a matter of law.

4.     Invasion of Privacy

Plaintiffs allege that defendants invaded their privacy in arresting Mr. Russ at the private funeral of their husband and father. The tort of "invasion of privacy by intrusion into seclusion" is defined in North Carolina as "the intentional intrusion 'physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . [where] the intrusion would be highly offensive to a reasonable person.'" Toomer v. Garrett, 155 N.C. App. 462, 479, 574 S.E.2d 76, 90 (2002) (quoting Miller v. Brooks, 123 N.C. App. 20, 26-27, 472 S.E.2d 350, 354 (1996), disc. rev. denied, 345 N.C. 344, 483 S.E.2d 172 (1997)) (alterations in original), disc. rev. denied, 357 N.C.

---

[10] Specifically, plaintiffs contend that defendants Brown and Jordan grabbed Mr. Russ while the casket was being placed into the hearse and failed to identify themselves as police officers; that defendant Brown used his Taser on Mr. Russ and that defendant Jordan threatened to use his on bystanders; that defendant Price threatened to arrest other funeral attendees who complained and planned the arrest itself. At most it could be argued that defendants Causey and McMahon authorized the arrest at the funeral by plainclothes officers, but not the failure to identify as police officers, the use or threatened use of a Taser, and the threats to arrest bystanders. Likewise, defendant MacNeish does not even appear to have been present for much or all of this conduct and was not part of the planning team for the arrest.

20

66, 579 S.E.2d 576 (2003). An intrusion occurs where the solitude, seclusion, private affairs, or personal concerns of a person are invaded in circumstances where that person would otherwise have a reasonable expectation of privacy. See Miller, 123 N.C. App. at 26-27, 472 S.E.2d at 354. "The kinds of intrusions that have been recognized under this tort include physically invading a person's home or other private place, eavesdropping by wiretapping or microphones, peering through windows, persistent telephoning, unauthorized prying into a bank account, and opening personal mail of another." Toomer, 155 N.C. App. at 479-80, 574 S.E.2d at 90 (internal quotation marks and citation omitted).

The parties maintain that this claim rises or falls with plaintiffs' constitutional tort for invasion of privacy under the Fourth Amendment. To the extent that the reasonable expectation of privacy for the state law claim is coextensive with that for the constitutional claim, plaintiffs' state law claim must fail where the court has already determined that plaintiffs had no reasonable expectation of privacy in the parking lot of the funeral home. Moreover, to the extent the two concepts of privacy are distinct, the court finds that plaintiffs' privacy was not invaded under the facts set forth here. The arrest of Mr. Russ in the public parking lot of a funeral home is not akin to "physically invading a person's home or other private place" where the funeral service was open to the public. See also Restatement (Second) of Torts § 652B cmt. c. (1981) (noting that an individual is not "in seclusion" where "his appearance is public and open to the public eye"). Accordingly, where the undisputed evidence does not demonstrate that plaintiffs had a reasonable expectation of privacy in the funeral home parking lot or that they were otherwise "in seclusion," plaintiffs have failed to assert an invasion of privacy claim under state law.

21

5.    Negligence

A common law negligence claim in North Carolina requires that plaintiffs establish (1) that defendants owed plaintiffs a legal duty, (2) that defendants breached that duty, and (3) that plaintiffs' injury was proximately caused by the breach. Martishius v. Carolco Studios, Inc., 355 N.C. 465, 473, 562 S.E.2d 887, 892 (2002). Through its discussion of plaintiff's negligent infliction of emotional distress claim, the court has effectively already determined that plaintiffs have alleged sufficient facts to bring a negligence claim: (1) Defendants owed a duty to act as reasonably prudent people would in exercising their official duties. Best, 337 N.C. at 752, 448 S.E.2d at 511-12. (2) A jury could find that they breached this duty on the facts viewed in the light most favorable to plaintiffs. (3) A jury could find that plaintiffs' severe emotional distress was produced by the "natural and continuous sequence" of defendants' actions, that the same "would not have occurred" without such conduct, and that "a person of ordinary prudence could have reasonably foreseen" that such severe emotional distress would occur. Hairston v. Alexander Tank & Equip. Co., 310 N.C. 227, 233, 311 S.E.2d 559, 565 (1984) (defining "proximate cause" in a negligence action). Accordingly, as with plaintiffs' negligent infliction of emotional distress claim, plaintiffs' alternative negligence claim is sufficient to survive summary judgment.[11]

---

[11] Indeed, because the only injury alleged by plaintiffs in their negligence action is severe emotional distress, this action appears to the court to be identical to plaintiffs' negligent infliction of emotional distress claim. Plaintiffs' negligence theory is apparently an alternative theory of recovery. In North Carolina, "a party may plead alternative theories of recovery based on the same conduct or transaction and then make an election of remedies." Stanley v. Moore, 339 N.C. 717, 724, 454 S.E.2d 225, 229 (1995). It is not clear, however, that plaintiffs may plead identical theories of recovery based on the same conduct and simply caption them differently. Nevertheless, the court need not decide this question now.

6.    Punitive Damages

Plaintiffs seek punitive damages from defendants in both their official and individual capacities. However, under North Carolina law, a plaintiff may not recover punitive damages against a governmental entity. Long v. City of Charlotte, 306 N.C. 187, 207-08, 293 S.E.2d 101, 114-15 (1982). Because the suit against defendants in their official capacities is in fact a suit against the Sheriff's Office, no punitive damages may be had against defendants in their official capacity. See, e.g., Staley v. Lingerfelt, 134 N.C. App. 294, 299, 517 S.E.2d 392, 396, disc. rev. denied, 351 N.C. 109, 540 S.E.2d 637 (1999); Houpe v. City of Statesville, 128 N.C. App. 334, 351, 497 S.E.2d 82, 93, disc. rev. denied, 348 N.C. 72, 505 S.E.2d 871 (1998).

As to the defendants in their individual capacities, "[p]unitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages" and also proves fraud, malice, or willful or wanton conduct by clear and convincing evidence. N.C. Gen. Stat. § 1D-15. "Willful or wanton conduct" is defined as "the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm." Id. § 1D-5(7). This can be shown by "a reckless indifference to the consequences of the act." Byrd v. Adams, 152 N.C. App. 460, 462, 568 S.E.2d 640, 642, disc. rev. denied, 356 N.C. 433, 572 S.E.2d 427 (2002). The court has already held that plaintiffs have put forward sufficient evidence as to defendants Brown, Jordan, and Price – and these defendants only – to put to a jury the theory that these defendants were recklessly indifferent. Accordingly, the punitive damages claim may go forward against these three defendants in their individual capacities.

23

D.    Analysis of State Law Immunity From Suit

The undisputed evidence is sufficient for plaintiff to proceed with their negligent infliction of emotional distress claim, intentional infliction of emotional distress claim against certain defendants, and negligence claim. However, these claims may nevertheless be barred by the various forms of immunity asserted by plaintiffs as affirmative defenses. The court therefore proceeds to address these defenses.

1.    Sovereign or Governmental Immunity

Defendants first raise the affirmative defense of sovereign or governmental immunity as to the claims against them in their official capacity, which are in fact claims against the New Hanover Sheriff's Office. See, e.g., Phillips v. Gray, 163 N.C. App. 52, 56-57, 592 S.E.2d 229, 232 ("The doctrine of sovereign immunity bars actions against public officials sued in their official capacities. Sheriffs and deputy sheriffs are considered public officials for purposes of sovereign immunity."), disc rev. denied, 358 N.C. 345, 599 S.E.2d 406 (2004); see also Myers v. Bryant, 188 N.C. App. 585, 587, 655 S.E.2d 882, 885, disc. rev. denied, 664 S.E.2d 309 (2008). Under the doctrine of sovereign immunity, the state and its agencies are immune from suit absent a waiver of immunity. Meyer v. Walls, 347 N.C. 97, 104, 489 S.E.2d 880, 884 (1997). Substantially the same immunity is given to a county and its agencies, absent a wavier, under the rubric of "governmental immunity." Craig ex rel. Craig v. New Hanover Bd. of Educ., 363 N.C. 334, 335, 678 S.E.2d 351, 353 n.3 (2009); Meyer, 347 N.C. at 104, 489 S.E.2d at 884.

North Carolina's legislature allows a waiver of immunity for a sheriff sued in his official capacity in one of two ways: (1) by purchase of an official bond under N.C. Gen. Stat. § 58-76-5 for acts of negligence in the performance of his official duties, or (2) by purchase of liability insurance

24

under N.C. Gen. Stat. § 153A-435. Smith v. Phillips, 117 N.C. App. 378, 383, 451 S.E.2d 309, 313 (1994); see also Myers, 188 N.C. App. at 585, 655 S.E.2d at 884. A sheriff is required by North Carolina law to purchase an official bond, see N.C. Gen. Stat. § 162-8, and the parties agree that there is no immunity for plaintiffs' claim against the $25,000.00 bond.[12] See, e.g., Summey v. Barker, 142 N.C. App. 688, 691, 544 S.E.2d 262, 265 (2001). It is also undisputed that the Sheriff's Office is insured through a liability insurance policy with the North Carolina Association of County Commissioners ("the NCACC Policy"). (Shell Decl. ¶ 3 & Ex. A.) The parties disagree, however, as to whether the insurance policy also waives immunity and thereby provides coverage above and beyond the $ 25,000.00 bond in this case. See, e.g., Myers, 188 N.C. App. at 588, 655 S.E.2d at 885; see also Smith, 117 N.C. App. at 383, 451 S.E.2d at 314.

Purchase of liability insurance waives immunity "only to the extent of the insurance obtained." Evans v. Housing Auth. of City of Raleigh, 359 N.C. 50, 57, 602 S.E.2d 668, 673 (2004). Thus, "[a] governmental entity does not waive sovereign immunity if the action brought against them is excluded from coverage under their insurance policy." Patrick v. Wake County Dept. of Human Servs., 188 N.C. App. 592, 596, 655 S.E.2d 920, 923 (2008); see, e.g., Craig, 363 N.C. at 336, 678 S.E.2d at 353 ("[B]ecause the [insurance] policy does not cover plaintiff's negligence claim, both statute and longstanding case law of this State establish that the Board has not waived immunity from suit."). In construing the policy to determine whether coverage exists for a particular claim, the court "follow[s] the traditional rules of contract construction . . . ." Dawes v. Nash County, 357 N.C. 442, 448, 584 S.E.2d 760, 764 (2003).

---

[12] Defendants move for summary judgment on the claim against the sheriff's bond because they contend that plaintiffs have failed to prove their common law tort claims. As discussed earlier, the court disagrees as to plaintiffs' claims of intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence.

Section VI(A)(1) of the NCACC Policy provides coverage for "money damages . . . result[ing] from personal injury, bodily injury, or property damage . . . occurring while a Covered Person is acting within the course and scope of the Covered Person's duties to provide law enforcement . . . ."[13] However, the policy also provides in pertinent part:

> The parties to this Contract intend for no coverage to exist under Section VI (Law Enforcement Liability Coverage) as to any claim for which the Covered Person is protected by sovereign immunity and/or governmental immunity under North Carolina law. It is the express intention of the parties to this Contract that none of the coverage set out herein be construed as waiving in any respect the entitlement of the Covered Person to sovereign immunity or governmental immunity.

NCAC Policy § VI(A). Elsewhere, in the "Exclusions" section of the NCACC Policy, the policy explicitly provides that coverage does not apply to "any claim, demand, or cause of action against any Covered Person as to which the Covered Person is entitled to sovereign immunity or governmental immunity under North Carolina law." Id. § VI(F). This language appears to unambiguously reserve immunity from suit as to any claim to which it would otherwise apply.

Plaintiffs offer two arguments as to why the insurance policy nevertheless waives immunity despite the exclusion. First, they contend that the exclusion does not apply because defendants are not "entitled to immunity" under North Carolina law where the official bond waives such immunity. However, the official bond waives immunity only for damages up to $25,000.00. See Summey, 142 N.C. App. at 690, 544 S.E.2d at 264; cf. Layman ex rel. Layman v. Alexander, 343 F. Supp. 2d 483, 494-95 (W.D.N.C. 2004) (granting summary judgment on claim because the full amount of the bond had already been paid in a prior state court judgment). Any effective waiver of immunity through

---

[13] A "Covered Person" includes "the law enforcement department of the Participant" to the policy and "each individual law enforcement officer or other employee of such department who is officially employed to engage in law enforcement duties." NCAC Policy § VI(H)(5)(b), (c). "Law Enforcement Employee" includes "any employee of the Participant's Sheriff's Department or any policy force operated by the Participant." Id. § VI(H)(7).

26

the insurance policy would have to be in addition to and separate from the waiver of the bond. See Smith, 117 N.C. App. at 383, 451 S.E.2d at 314 (noting that an insurance policy "complement[s]" the bond by "insuring an adequate remedy for wrongs done to the plaintiff if . . . the bond does not provide an adequate remedy"). In light of these principles, the court concludes that the exclusion in the NCACC Policy is written so as to retain immunity for liability in any amount above the $25,000.00 covered by the official bond.

Plaintiffs also argue that the policy is ambiguous and its provisions illusory because its coverage conflicts with its exclusions. Any ambiguity in an exclusionary clause must be resolved in favor of coverage, see Patrick, 188 N.C. App. at 596, 655 S.E.2d at 924; see also State Capital Ins. Co. v. Nationwide Mut. Ins. Co., 318 N.C. 534, 538, 350 S.E.2d 66, 68 (1986), but the court does not find that an ambiguity is present here. Although the exclusion covering acts for which defendants maintain sovereign immunity is indeed broad enough to exclude most torts that would otherwise be covered by the policy, it is not so broad as to be illusory or internally inconsistent. See Estate of Earley v. Haywood County Dept. of Soc. Servs., ___ N.C. App. ___, ___, ___ S.E.2d ___, ___, 2010 WL 2163776, at *3-4 (June 1, 2010) (finding similar language unambiguous and refusing to find a waiver of immunity despite the "arguably circular logic" that a "[d]efendant retains immunity because a policy doesn't cover his actions and the policy doesn't cover his action because he explicitly retains immunity").

Where "[w]aiver of sovereign immunity may not be lightly inferred and State statutes waiving this immunity . . . must be strictly construed," Guthrie v. N.C. State Ports Auth., 307 N.C. 522, 537-38, 299 S.E.2d 618, 627 (1983), the court cannot agree that the insurance policy as written operates to waive sovereign immunity beyond that already waived by the $25,000.00 official bond.

27

Accordingly, the court concludes that defendants do not enjoy immunity from suit against them in their official capacities for any amount not exceeding $25,000.00, but retain immunity from suit for damages in excess of $25,000.00.[14]

2.    Public Officer's Immunity

Defendants also assert the affirmative defense of public officer's immunity. Sheriffs and deputy sheriffs are public officers, see Blake v. Allen, 221 N.C. 445, 449, 20 S.E.2d 552, 554 (1942); Summey, 142 N.C. App. at 691, 544 S.E.2d at 265, and as such may be entitled to this form of immunity. See, e.g., Messick v. Catawba County, 110 N.C. App. 707, 718, 431 S.E.2d 489, 496, disc. rev. denied, 334 N.C. 621, 435 S.E.2d 336 (1993). Under the doctrine of public officer's immunity, "[p]ublic officials cannot be held individually liable for damages caused by mere negligence in the performance of their governmental or discretionary duties," but instead are liable only where their actions were "corrupt or malicious, or . . . outside of and beyond the scope [their] duties." Meyer, 347 N.C. at 112, 489 S.E.2d at 889. A public officer "acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial and injurious to another." Grad v. Kaasa, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984). The act must be "done of wicked purpose, or . . . done needlessly,

_____

[14] Although not entitled to precedential weight here, the court notes that the North Carolina Court of Appeals appears to have reached substantially the same conclusion in a recent unpublished case involving a nearly identical exclusion contained in an NCACC insurance policy. See Frink v. Batten, 676 S.E.2d 670, 2009 WL 1383322 (N.C. Ct. App. May 19, 2009) (unpublished table decision). The exclusion in the policy before the court in Frink stated that coverage did not apply to "any claim . . . [or] cause of action against Participant . . . as to which the Participant . . . [is] entitled to sovereign immunity or governmental immunity under North Carolina law." Id. at *5 (alterations in original). Although the court of appeal's opinion did not address each of the specific objections raised by plaintiffs here, that court did determine that the exclusion operated so as not to waive sovereign immunity and that the defendant sheriff had waived immunity only to the extent of his $25,000.00 bond. Id. at *5-7.

manifesting a reckless indifference to the rights of others." Id. at 313, 321 S.E.2d at 891 (quoting Givens v. Sellars, 273 N.C. 44, 50, 159 S.E.2d 530, 535 (1968)).

The court first notes that plaintiffs' claim of intentional infliction of emotional distress is an intentional tort. See Holloway, 339 N.C. at 351, 452 S.E.2d at 240. Public officer's immunity is not available in cases of intentional torts. Bradley v. Ramsey, 329 F. Supp. 2d 617, 626 (W.D.N.C. 2004); see also Pruitt v. Pernell, 360 F. Supp. 2d 738, 746 (E.D.N.C. 2005) (noting this rule in dicta). Therefore, defendants Brown, Jordan, and Price are not entitled to immunity from suit in their individual capacity for this claim. See, e.g., Bradley, 329 F. Supp. 2d at 626 (denying public officer's immunity for a claim of intentional infliction of emotional distress).

Plaintiffs' remaining claims of negligent infliction of emotional distress and negligence are claims for which public officer's immunity may apply, unless there is a showing of malice by plaintiffs. This showing is difficult to make where "it is presumed that a public official in the performance of his official duties acts fairly, impartially, and in good faith and in the exercise of sound judgment or discretion, for the purpose of promoting the public good and protecting the public interest." In re Annexation Ordinance No. 300-X, 304 N.C. 549, 551, 284 S.E.2d 470, 551 (1981) (internal quotation marks omitted). "[T]he burden is on [plaintiffs] to overcome the presumption [of good faith] by competent and substantial evidence," id., and "every reasonable intendment will be made in support of the presumption [of good faith]," Huntley v. Potter, 255 N.C. 619, 628, 122 S.E.2d 681, 687 (1961).

This showing has not been made here as to defendants Causey, McMahon, and MacNeish. As the court has noted, plaintiffs' two negligence claims are essentially the same as their intentional infliction of emotional damages claim. The latter claim has the additional elements that defendants

29

engaged in "extreme and outrageous conduct" that was intentional or conducting with "reckless indifference to the likelihood that they will cause severe emotional distress." See Dickens, 302 N.C. at 452, 276 S.E.2d at 335. The court has found that plaintiffs have put forward sufficient evidence of extreme and outrageous conduct and reckless indifference to go forward as to defendants Jordan, Brown, and Price, but not the other defendants, who at best were merely negligent. Mere negligence is insufficient to overcome a public officer's immunity.

## CONCLUSION

For the reasons set forth above, the court GRANTS IN PART and DENIES IN PART defendants' motion for summary judgment (DE # 52). The court also DENIES defendants' motion to strike plaintiffs' exhibits M, N, and Q (DE # 56), but ALLOWS defendants' motion to strike plaintiffs' exhibits V and W (DE # 58). In sum:

(1)     Defendants' motion for summary judgment is GRANTED as to the § 1983 claim, both in their individual and official capacities. First, defendants are entitled to qualified immunity in their individual capacity. Second, because plaintiffs have failed to demonstrate a constitutional violation, the § 1983 claims against defendants in their official capacities also fail.

(2)     Defendants' motion for summary judgment is GRANTED as to the claim of assault against defendant Jordan; the claim of intentional infliction of emotional distress against defendants Causey, McMahon, and MacNeish; the claim of invasion of privacy as against all defendants, and the claim for punitive damages as against all defendants in their official capacities and defendants Causey, McMahon, and MacNeish in the individual capacities. The undisputed facts are insufficient to submit these claims to a jury.

(3)     Defendants' motion for summary judgment is DENIED as to the claim of negligent

30

infliction of emotional distress against all defendants; the claim of intentional infliction of emotional distress against defendants Brown, Jordan, and Price; the alternative claim of negligence against all defendants; and the punitive damages claim against defendants Brown, Jordan, and Price in their individual capacities. These claims are allowed to proceed except insofar as recovery is barred by immunity from suit as set forth below.

(4)     Defendants' motion for summary judgment is GRANTED as to the affirmative defense of sovereign or governmental immunity. Defendants in their official capacities are immune from suit to the extent that liability exceeds the $ 25,000.00 sheriff's bond. They are not immune from damages not exceeding this amount.

(5)     Defendants Causey, McMahon, and MacNeish's motion for summary judgment is GRANTED as to the affirmative defense of public officer's immunity. Defendants Causey, McMahon, and MacNeish are entitled to such immunity as to the remaining negligence claims against them in their individual capacity. No further claims remain against these defendants in their individual capacities.

(6)     Defendants Brown, Jordan, and Price's motion for summary judgment is DENIED as to the affirmative defense of public officer's immunity. These defendants  are not entitled to public officer's immunity for either the intentional infliction of emotional distress claim or the two additional negligence claims arising out of the same circumstances.

(7)     Plaintiffs have withdrawn their claim of negligent misrepresentation. That claim is DISMISSED without prejudice.

(8)     The remaining claims are as follows: (a) intentional infliction of emotional distress against defendants Brown, Jordan, and Price; (b) negligent infliction of emotional distress against

31

all defendants in their official capacities, and defendants Brown, Jordan, and Price in their individual capacities; (c) negligence against all defendants in their official capacities, and defendants Brown, Jordan, and Price in their individual capacities; and (d) punitive damages against defendants Brown, Jordan, and Price in their official capacities.

(9)     At informal conference with the parties on January 27, 2010, as memorialized by order entered that day, the court discontinued with consent of the parties the trial of this matter in light of defendants' motion for summary judgment. Decision on that motion now having been entered in the form of the instant order, the parties are hereby DIRECTED to confer and submit to the court within 21 days from date of entry of this order a proposed pre-trial and trial schedule for this matter, including also whether referral of the case for a second or successive mediation effort is requested.

SO ORDERED, this the 5th day of August, 2010.

_____
LOUISE W. FLANAGAN
Chief United States District Court Judge

32